FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 MAR 28  AM II: 34

US. DISTRICT COURT
N.D. OF ALABAMA

JOHN G. HUDSON; H. EVAN ZEIGER,   *
JR.; MARGARET S. ZEIGER; WILLIAM   *
R. STRICKLAND; MARCIA A.   *
STRICKLAND: EASTERN FLATBUSH   *
EXTENSION COMPANY, L.D.C.;   *
HUGH B. JACKS; LINDA GRAVES   *
RICHEY TRUST; ROBERT EARL   *
RICHEY TRUST; CHRISTOPHER KEITH *
RICHEY TRUST; STANLEY L. GRAVES; *
JOHN RUSSELL THOMAS; JAMES T.   *
PARSONS; KAUFMAN-BARROW   *
PROPERTIES; JOHN MUSSO; PATSY   *
H. GRAVES; GRAVES TECHNOLOGY   *
PARTNERSHIP LTD; and CANAMAP,   *
LDC;   *
  *
     Plaintiffs,   *
  *
vs.   *
  *
THE GOLF CHANNEL; TGC, INC.; TGC, *
INC. d/b/a THE GOLF CHANNEL;   *
ARNOLD D. PALMER, individually and   *
in his official capacity as Chairman of the   *
Board of TGC, Inc. and as a founder and   *
shareholder in TGC, Inc.; JOSEPH   *
E. GIBBS, individually and in his official   *
capacity as President and/or Chief   *
Executive Officer of TGC, Inc. and as a   *
founder and shareholder in TGC, Inc.;   *
CHRISTOPHER R. MURVIN, individually *
and in his official capacity as Senior Vice   *
President and as a founder and shareholder   *
in TGC, Inc.; DAVID A. BARRY,   *
individually and in his official   *
capacity as a Director, founder and as a   *
shareholder in TGC, Inc.; BARISTON   *
PROGRAMMING, INC., a corporation;   *

     Defendants.

CIVIL ACTION  NO. CV-C-0864-S

## THIRD AMENDED COMPLAINT

### I. INTRODUCTION

1. This action is brought by John G. Hudson; H. Evan Zeiger, Jr.; Margaret S. Zeiger; William R. Strickland; Marcia A. Strickland; Eastern Flatbush Extension Company, L.D.C.; Canamap, L.D.C.; Hugh B. Jacks; Linda Graves Richey Trust; Robert Earl Richey Trust; Christopher Keith Richey Trust; Stanley L. Graves; Patsy H. Graves; Graves Technology Partnership, Ltd.; John Russell Thomas; James T. Parsons; Kaufman-Barrow Properties; and John Musso; as plaintiffs to secure redress for the unlawful practices engaged in by defendants TGC, Inc.; TGC, Inc. d/b/a The Golf Channel; The Golf Channel; Arnold Palmer; Joseph E. Gibbs, Christopher R. Murvin; and David A. Barry. Defendants are persons or entities who through unlawful and wrongful acts have profited from or are profiting from the sale of stock in TGC, Inc. to Comcast Programming Holdings, Inc. (hereinafter "Comcast"). In doing so, said defendants have caused damages to the aforementioned plaintiffs. Plaintiffs assert these claims in order to obtain:

a. A trial by jury in this matter;

b. A judgment against defendants;

c. Damages based on the compensatory injuries these plaintiffs have suffered as a result of the defendants actions;

d. Damages based on the dilution of the value of the plaintiffs stock;

e. A disgorgement of the unlawful profits obtained by these defendants;

f. Punitive damages;

Page 2

g. Interest, attorney's fees and court costs; and

h. Such other, further and different relief as the Court deems appropriate.

2. The gist of plaintiffs' complaint is that due to the defendants' actions, the plaintiffs' investment in TGC is currently worth less than 80% of its original value, when acquired in 1992, while the individual defendants and certain other investors will receive 4 ½ to 5 times as much as their original investment.

## II. PARTIES: GENERAL

3. Whenever this Complaint alleges that TGC did any act or thing, it is collectively meant that TGC, Inc.; TGC, Inc. d/b/a The Golf Channel; The Golf Channel; Arnold Palmer; Joseph E. Gibbs, Christopher R. Murvin; David A. Barry; Bariston Programming, Inc.; and/or other directors or founders of said entities, or their subsidiaries, affiliates, directors, officers, agents, or employees who performed or participated in such thing; and/or any other persons or entities who worked with, conspired with, aided or abetted or otherwise contributed to plaintiffs' injuries.

4. Plaintiffs are shareholders of TGC, Inc., who based their investment decisions regarding TGC, Inc. on information supplied by TGC, Inc. Plaintiffs relied on the representations of TGC, Inc. to their detriment. TGC, Inc. had both contractual and/or fiduciary duties which they breached, thereby causing plaintiffs damages.

5. At all relevant times to the matters contained herein, defendants owed a fiduciary duty to plaintiffs.

## II.  PARTIES: SPECIFIC

6.   Plaintiff John G. Hudson is an individual over nineteen years of age.  He is a resident of Shelby County, Alabama and a shareholder in TGC, Inc.

7.   Plaintiffs H. Evan Zeiger and Margaret S. Zeiger are individuals over nineteen year of age and residents of Jefferson County, Alabama.  They are shareholders in TGC, Inc. as joint tenants with the right of survivorship.

8.   Plaintiffs William R. Strickland and Marcia A. Strickland are individuals over nineteen year of age and residents of Jefferson County, Alabama.  They are shareholders in TGC, Inc. as joint tenants with the right of survivorship.

9.   Plaintiff Eastern Flatbush Extension Company, L.D.C. is a business entity which is also an owner of shares of TGC, Inc.  Eastern Flatbush Extenstion Company, L.D.C. is a Cayman Islands corporation.  Canamap, L.D.C. is the successor in interest to Eastern Flatbush.

10.   Plaintiff Hugh B. Jacks is an individual over nineteen year of age and resident of Shelby County, Alabama.  He is a shareholder in TGC, Inc.

11.   Plaintiffs Linda Graves Richey Trust, Robert Earl Richey Trust and Christopher Keith Richey Trust are Trusts organized under the Ronald K. Richey 1993 Children's Trust Agreement dated June 29, 1993.  Said Trusts are shareholders of TGC, Inc.  (Hereinafter collectively referred to as "The Richey Trusts.")

12.   Plaintiff Stanley L. Graves and Patsy H. Graves are individuals over nineteen years of age and residents of Shelby County, Alabama.  They are shareholders in TGC, Inc.  Graves Technology Partnership, Ltd. is a partnership which is the successor in interest of Stanley L. Graves and Patsy H. Graves.

13. Plaintiff John Russell Thomas is an individual over nineteen years of age and resident of Shelby County, Alabama. He is a shareholder in TGC, Inc.

14. Plaintiff James T. Parsons is an individual over nineteen years of age and resident of Alabama, who was a shareholder in TGC, Inc. at all times relevant to this lawsuit.

15. Plaintiff Kaufman-Barrow Properties is a business entity which at all times relevant to this lawsuit was a shareholder in TGC, Inc.

16. Plaintiff John Musso is an individual over nineteen years of age and resident of Illinois, who was a shareholder of TGC, Inc. at all times relevant to this lawsuit.

17. Defendants TGC, INC.; TGC, INC. d/b/a The Golf Channel; and The Golf Channel are hereinafter collectively referred to as "TGC." TGC, Inc. is a Delaware Corporation which qualified to do business in Alabama on August 5, 1992. However, TGC, Inc. withdrew from the State of Alabama on February 11, 1999. TGC's agent for service of process purposes is: "C. Murvin, 7580 Commerce Center Drive, Orlando, Florida 32819."

18. Defendant Arnold D. Palmer is an individual and to plaintiffs' best information and belief is a resident of Pennsylvania or Florida and is over nineteen years of age. Palmer is a co-founder of TGC and has served as Chairman of the Board of TGC, Inc.

19. Defendant Joseph E. Gibbs is an individual resident of Shelby County, Alabama and is over nineteen years of age. Gibbs is a co-founder, and various times is or has been Vice Chairman, President and Chief Executive Officer of TGC.

20. Defendant Christopher R. Murvin is an individual resident of Orlando, Florida and is over nineteen years of age. Murvin is a co-founder, and various times is or has been Senior Vice President of Legal and Business Affairs, General Counsel and Director of TGC. During times

Page 5

relevant to this complaint Murvin maintained his office and resided in Jefferson County, Alabama.

21. Defendant David A. Barry is an individual resident of Boston, Massachusetts and is over nineteen years of age. Barry is a co-founder and investor in TGC. Barry's shares in TGC are/were beneficially owned by Barry but are/were held in the name of Bariston Programming, Inc. Whenever "Barry" is identified in this complaint it should be read to include both Barry and Bariston Programming, Inc. where appropriate.

### III. FACTUAL ALLEGATIONS FROM WHICH CLAIMS ARISE

22. The allegations of paragraphs 1-21 above are reasserted as if herein set forth.

23. TGC, Inc. was incorporated in 1992 in Delaware. The purpose of the corporation was to begin a television channel know as "The Golf Channel." "The Golf Channel" was to provide the following programming:

a. 24 hour a day, seven days a week of nothing but golf;

b. Live and tape delay coverage of golf tournaments from around the world: U.S. PGA, Senior PGA, Ladies PGA, the Hogan Tour, Europe, Africa, Australia and Japan; [sic] ("PGA" as used herein refers to the Professional Golf Association).

c. Hands-on golf instruction from the world's leading teaching pros;

d. Golf news, live appearances and interviews with the stars of yesterday, today and tomorrow, escorted video tours of the great golf courses of the world; and

e. Interactive and participatory programming, with ample opportunities for viewers to call in, play along, get personalized critiques and hints, and buy top merchandise at "direct-to-you" prices.

24. On or about June 1, 1992, TGC devised a plan by which shares in TGC would be offered and sold pursuant to a private placement. This plan was described in a document entitled an Informational Briefing (hereinafter "Briefing"). This Briefing included information and representations designed to induce plaintiffs to invest in TGC.

25. TGC represented through the Briefing that it had developed a Capital Formation Plan which projected a total capital requirement of $100 million. This plan included capital for pre-operation and start-up costs of approximately $21 million and for the projected shortfall from operations during operating Years 1 and 2. To meet this requirement, TGC planned to fulfill such capital requirements in two investment rounds, as follows:

a. Round 1: Round 1 would provide the first $6 million of seed capital for initial start-up expenses, deposits for a satellite transponder and programming rights and for other related purposes. Round 1 was to be offered privately beginning in July 1992, and the purchasers were guaranteed a fully diluted ownership interest in TGC of approximately 15% (14.85%).

b. Round 2: Round 2 was to be offered within 90 days of the closing of Round 1. It would involve raising approximately $94 million in capital. The investors in Round 2 were to have a fully diluted ownership interest of approximately 40% (39.60%).

c. The remaining 45% was to be held by the Founders (34.65%), Management (9.90%), and Directors (1%).

26. Plaintiffs are "Round 1 Investors."

27. On or about July 1, 1992, a Private Offering Memorandum (hereinafter "Memorandum") was distributed to persons, including but not limited to the plaintiffs. The Memorandum indicated that the initial Board of Directors included: Arnold D. Palmer; Joseph E. Gibbs; David A. Barry; and

Christopher R. Murvin. The four individual defendants (Palmer, Gibbs, Barry and Murvin) are the "Founders" of TGC and are hereinafter jointly referred to as such.

28. The Memorandum was a specific offer made by TGC and the Founders to plaintiffs and others to invest in TGC. Through the Memorandum TGC and the Founders offered "Investment Units" for purchase. An Investment Unit was comprised of 100 shares of TGC's Class A Preferred Stock and 2,500 shares of TGC's Class B Common Stock. The purchase price of these Investment Units was $100,000.

29. TGC made the following specific representations to plaintiffs in the Memorandum:

a. "Following the completion of this offering, [Round 1] and assuming that all 60 Investment Units are sold, purchasers of Investment Units will hold approximately thirty percent (30%) of the outstanding common equity of the Company and the founding stockholders will hold approximately seventy percent (70%) of the outstanding common equity of the Company." (Paragraph 11, Pages 8-9)

b. "The dilution resulting from the contemplated subsequent offering [Round 2] to raise an additional $94,000,000 will not, however, reduce the common equity represented by the Investment Units to less than 14.85% of total common equity." (Paragraph 12, Page 9)

c. "Collectively, the purchasers of Investment Units in this offering will not be diluted below 14.85% of the common equity of the Company as a result of the proposed subsequent offering should the terms thereof be less favorable than as contemplated herein. Any disproportionate dilution resulting from such less favorable terms shall be absorbed by the founding stockholders who, collectively, have agreed to surrender such number of shares of Class A Common Stock as are necessary to preserve the common equity position of Investment Unit purchasers as aforesaid."

Page 8

(Pages 12-13)

d. "Therefore, the Company reserves the right to modify the terms of the second round of financing in order to acquire the equity necessary to launch and operate 'The Golf Channel.' Except as limited below, any such modification will not operate to dilute below 14.85% the common equity interest of Investment Unit purchasers. Any disproportionate dilution resulting from modified terms shall be absorbed by the founding stockholders who, collectively, have agreed to surrender such number of shares of Class A Common Stock as is necessary to preserve the common equity position of Investment Unit purchasers as aforesaid." (Pages 28-29)

30. At the time the Memorandum was circulated, the Founders held the following ownership interest in TGC:

a. Arnold Palmer, 157, 500 shares of Class A Common Stock (45%);

b. Joseph E. Gibbs, 157,500 shares of Class A Common Stock (45%);

c. David A. Barry, 17,500 shares of Class A Common Stock (5%); and

d. Christopher R. Murvin, 15,750 shares of Class A Common Stock (4.5%).

31. TGC described the voting rights of the various classes of stock as follows:

a. Class A Common Stock—are entitled to three votes for each share of stock held of record.

b. Class B Common Stock—are entitled to one vote for each share of stock held of record.

c. Class A Preferred Stock—has no voting rights.

Accordingly, TGC was established to so that the Founders would retain voting control of the Company. As such, the Founders owed a fiduciary duty to the minority shareholders. Such fiduciary duty, among other things: prohibits the Founders from abusing their position for personal or family advantage to the detriment of the corporation or other stockholders; imposes an obligation

Page 9

to be responsible for any wrongful or negligent action; prohibits fiduciary self-dealing; proscribes that no advantage may be taken due to the fiduciary's position in the company; imposes the requirement of dealing in good faith; prohibits the exercise of improper influence in the management of the affairs of the company. The United States Supreme Court long ago announced and continues to enforce fiduciary requirements on majority stockholders as follows:

> A majority stockholder owes a fiduciary duty to minority stockholders.... He who is in such a fiduciary position cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters.... He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis. Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238 (1939). The Alabama Supreme Court has held similarly by noting that corporate officers are required to act with fidelity and in good faith, subordinating their personal interests to the interests of the corporation and the other stockholders. Hardy v. Hardy, 507 So.2d 404 (Ala.1986).

32. The Founders owed such a fiduciary obligation to the plaintiffs as the plaintiffs invested in TGC in Round 1 of the Capitalization Plan as follows:

   a. John G. Hudson—1 Investment Unit;

   b. H. Evan Zeiger, Jr. and Margaret S. Zeiger—2 Investment Units;

   c. William R. Strickland and Marcia A. Strickland—1 Investment Unit;

Page 10

    d. Eastern Flatbush Extension Company, L.D.C.—5 Investment Units;

    e. Hugh B. Jacks—1/2 Investment Unit;

    f. The Richey Trusts—3 Investment Units;

    g. Stanley L. Graves and Patsy H. Graves—1/2 Investment Unit;

    h. John Russell Thomas—1 Investment Unit;

    i. James T. Parsons—1/2 Investment Unit;

    j. Kaufman-Barrow Properties—1/2 Investment Unit; and

    k. John Musso—1 Investment Unit.

Collectively the plaintiffs purchased 16 (26.7%) of the 60 Investment Units initially offered in Round 1 of the Capitalization Plan. According to the representations of TGC and its Founders, plaintiffs should not be diluted below 3.965% (26.7% of 14.85%) of the common equity of the Company as a result of the subsequent financing.

    33. TGC and the Founders engaged in a subterfuge in order to avoid their obligations and representations by which they induced the plaintiffs to purchase stock in TGC. Originally, TGC was to raise $94,000,000 to $100,000,000 in Round 2 of the Capitalization Plan. Instead, the Founders diluted plaintiffs stock and in bad faith and through self-dealing took advantage of their majority position in TGC to proximately cause plaintiffs' injuries.

    34. The subterfuge by TGC and the Founders occurred as follows:

    a. TGC and the Founders on November 30, 1993, by letter advised the plaintiffs that they were required to raise an additional $3 million in order to obtain a 12 month extension of certain contract options with various entities (the PGA Tour, the LPGA Tour and the Foreign Tours). TGC and the Founders requested the plaintiffs to invest their pro-rata share in order to purchase additional

stock.

b. Following this $3 million capitalization, TGC and the Founders raised "Round 2 financing" in two separate installments:

i). On or about May 16, 1994, TGC and the Founders approved a $60 million investment;

ii). On or about March 15, 1996, TGC and the Founders began efforts to raise an additional $35 million to $50 million in equity;

iii). On July 31, 1996, Twentieth Holdings Corporation invested $50 million in TGC stock;

iii). Thereafter, TGC and the Founders began referring to the aforementioned $3 million capitalization as "Round 2"; the $60 million equity investment as "Round 3"; and the $50 million additional equity as "Round 4."

iv). In fact, "Round 2" of the capitalization plan was not completed until the contemplated $95-100 million in additional financing was raised and therefore, plaintiffs were entitled to their undiluted equity interest as of that time.

35. On or about January 15, 1996, TGC and the Founders sought a "$15 million Bridge Loan" which they claimed was necessary to keep The Golf Channel afloat until an additional $50 million could be obtained. The Plaintiffs were given 60 days to invest (until March 15, 1996). Based upon the information provided by TGC and the Founders, the Plaintiffs did not invest in this Bridge Loan. TGC and the Founders acted improperly with regard to this Bridge Loan in that they:

a). Failed to provide an accurate picture of the condition of The Golf Channel and/or the likelihood of obtaining the additional $50 million in equity financing;

Page 12

b). Withheld information necessary for the Plaintiffs to make a informed decision;

c). Failed to provide full disclosure and/or provided inaccurate information;

d). Provided false or misleading information with the intent to encourage the Plaintiffs not to invest in the Bridge Loan;

e). Controlled the closing date for the additional $50 million in equity financing so as to create the maximum advantage to TGC and the Founders and the maximum disadvantage to the Plaintiffs;

f). Manipulated the affairs of the corporation to the Plaintiffs detriment and in disregard of the standards of common decency and honesty;

g). Utilized inside information and their strategic position for their own preferment;

h). As a result of the activities described above, the money of TGC and the Founders, which was at risk for a mere 60 days during the life of The Golf Channel, acquired a disproportionate equity interest.

36. On or about September 30, 1998, the Founders entered into a Call Option and Put Agreement with Comcast. This agreement was not disclosed to the plaintiffs and affected their substantial rights. Plaintiffs became aware of this Call Option and Put Agreement on February 17, 2000.

37. By February 25, 2000 Comcast completed the acquisition of the Founders shares and at that time disclosed the existence of the Call Option and Put Agreement and its substantially adverse effect upon the plaintiffs. Pursuant to this Agreement plaintiffs were provided tag along rights which expire April 5, 2000. This limited time frame is unconscionable and unreasonable.

Page 13

## IV. INJURIES AND DAMAGES

38. Through TGC organizational documents an appraisal of TGC's fair market value was required to be established by December 31, 1999. An appraisal was required to be performed by three nationally recognized appraisal firms with experience in valuing businesses of the type conducted by The Golf Channel. The first appraiser was selected by the holders of Founders Stock, the second appraiser was selected by the majority holders of the other classes of stock, and the third appraiser was selected by the first two appraisers. In fact, the "holders of Founders Stock" and "the majority holders of the other classes of stock" are one and the same. The plaintiffs had no input in the selection of the appraisers.

39. This process established TGC's fair market value as of December 31, 1999 to be $675,666,667. Accordingly, the value of the plaintiffs' investment should be collectively worth $26,756,395.98 and separately:

a. John G. Hudson—$1,672,274.75 (1 Investment Unit);

b. H. Evan Zeiger, Jr. and Margaret S. Zeiger—$3,344,549.50 (2 Investment Units);

c. William R. Strickland and Marcia A. Strickland—$1,672,274.75 (1 Investment Unit);

d. Eastern Flatbush Extension Company, L.D.C.—$8,361,373.75 (5 Investment Units);

e. Hugh B. Jacks—$836,137.37 (1/2 Investment Unit);

f. The Richey Trusts—$5,016,824.25 (3 Investment Units);

g. Stanley L. Graves and Patsy H. Graves—$836,137.37 (1/2 Investment Unit);

h. John Russell Thomas—$1,672,274.75 (1 Investment Unit);

i. James T. Parsons—$836,137.37 (1/2 Investment Unit);

j. Kaufman-Barrow Properties—$836,137.37 (1/2 Investment Unit); and

Page 14

k. John Musso—$1,672,274.75 (1 Investment Unit).

40. By letter dated February 17, 2000 plaintiffs learned that several months prior, Defendants Palmer and Gibbs and certain others agreed to sell their stock to Comcast Corporation and to allow Comcast to acquire majority control of TGC. The Founders agreement with Comcast requires Comcast to offer to purchase Round 1 investors' stock. This purchase window is to expire April 5, 2000.

41. By letter dated February 25, 2000, plaintiffs were informed that each Investment Unit would be valued at $79,172.00. Accordingly, the value of the plaintiffs' investment will be collectively worth $1,187,580.00 and separately:

a. John G. Hudson—$79,172.00 (1 Investment Unit);

b. H. Evan Zeiger, Jr. and Margaret S. Zeiger—$158,344.00 (2 Investment Units);

c. William R. Strickland and Marcia A. Strickland—$79,172.00 (1 Investment Unit);

d. Eastern Flatbush Extension Company, L.D.C.—$395,860.00 (5 Investment Units);

e. Hugh B. Jacks—$39,586.00 (1/2 Investment Unit);

f. The Richey Trusts—$237,516.00 (3 Investment Units);

g. Stanley L. Graves and Patsy H. Graves—$39,586.00 (1/2 Investment Unit);

h. John Russell Thomas—$79,172.00 (1 Investment Unit);

i. James T. Parsons—$39,586.00 (1/2 Investment Unit);

j. Kaufman-Barrow Properties—$39,586.00 (1/2 Investment Unit); and

k. John Musso—$79,172.00 (1 Investment Unit).

42. TGC and the Founders have proximately caused injuries and damages to the plaintiffs in the following amounts:

a. John G. Hudson—$1,593,102.75 (1 Investment Unit);

b. H. Evan Zeiger, Jr. and Margaret S. Zeiger—$3,186,205.50 (2 Investment Units);

c. William R. Strickland and Marcia A. Strickland—$1,593,102.75 (1 Investment Unit);

d. Eastern Flatbush Extension Company, L.D.C.—$7,965,513.75 (5 Investment Units);

e. Hugh B. Jacks—$796,551.37 (1/2 Investment Unit);

f. The Richey Trusts—$4,779,308.25 (3 Investment Units);

g. Stanley L. Graves and Patsy H. Graves—$796,551.37 (1/2 Investment Unit);

h. John Russell Thomas—$1,593,102.75 (1 Investment Unit);

i. James T. Parsons—$796,551.37 (1/2 Investment Unit); and

j. Kaufman-Barrow Properties—$796,551.37 (1/2 Investment Unit).

k. John Musso—$1,593,102.75 (1 Investment Unit);

The total damages to the plaintiffs collectively amounts to $25,489,643.98.

43.   Additionally, and/or alternatively, the plaintiffs have suffered significant economic injuries in that the value of their TGC stock has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what was represented to them by the defendants. In fact, the plaintiffs' investment in TGC is worth less today than when it was acquired in 1992 while the defendants will receive many, many times their original investment and certain other investors will receive from 4 ½ to 5 times as much as their original investment.

## V. STATUTE OF LIMITATIONS

44.   Any statute of limitations otherwise applicable to any part of the plaintiffs or any part of the plaintiffs' claims has been tolled by virtue of:

Page 16

a. The continuation of the unlawful conduct until present.

b. The subterfuge designed by the defendants to make it appear that Round 2 financing occurred earlier than it actually did.

c. The original representations concerning the initial investors undiluted 14.85% equity interest contained no time constraints and therefore were not actionable until the $95-100 million in equity financing was obtained.

d. The tolling statutes contained in the applicable laws.

45. The earliest a breach of contract could accrue is May 31, 1994 when the $60 million investment was obtained.

46. For purposes of Alabama law the letters of February 17, 2000 and February 25, 2000 created a justiciable controversy providing this Court for the first time, subject matter jurisdiction. The aforementioned letters provided the discernible injury to the plaintiffs which heretofore was not ripe for adjudication. (See, Stringfellow v. State Farm Insurance Company, Ala. S.Ct. Case No 1980533 decided September 17, 1999; Williamson v. Indianapolis Life Insurance Company, 741 So.2d 1057 (Ala. 1999).

## VI. CAUSES OF ACTION

### COUNT ONE: Breach of Contract

47. Plaintiffs reassert the allegations set forth in paragraphs 1 through 46 above as if herein set forth.

48. TGC and the Founders made an offer to the plaintiffs that if the plaintiffs were to invest in Round 1, they would receive a pro rata fully diluted ownership interest in TGC of 14.85%.

49. Plaintiffs accepted that offer provided the defendants with valuable consideration by investing $1.5 million in TGC.

50. Such is a lawful object of a contract.

51. Plaintiffs performed their obligations under the contract. The defendants have failed to perform their obligations under the contract.

52. As a proximate consequence the plaintiffs have been damaged.

53. Plaintiffs demand judgment against the defendants in an amount of damages that would place the plaintiffs in the same condition they would have occupied if the contract had not been breached.

54. Plaintiffs further demand prejudgment interest at the applicable rate, along with costs and attorney fees.


## COUNT TWO: Intentional, Willful and Reckless Fraud

55. Plaintiffs reassert the allegations set forth in paragraphs 1 through 54 above as if herein set forth.

56. Defendants knowingly and/or willfully and/or recklessly misrepresented a material fact to the plaintiffs. Namely that if the plaintiffs invested in Round 1 of the capitalization plan they would receive, among other things, the following benefits:

a. "Following the completion of this offering, [Round 1] and assuming that all 60 Investment Units are sold, purchasers of Investment Units will hold approximately thirty percent (30%) of the

outstanding common equity of the Company and the founding stockholders will hold approximately seventy percent (70%) of the outstanding common equity of the Company." (Paragraph 11, Pages 8-9)

b. "The dilution resulting from the contemplated subsequent offering [Round 2] to raise an additional $94,000,000 will not, however, reduce the common equity represented by the Investment Units to less than 14.85% of total common equity." (Paragraph 12, Page 9)

c. "Collectively, the purchasers of Investment Units in this offering will not be diluted below 14.85% of the common equity of the Company as a result of the proposed subsequent offering should the terms thereof be less favorable than as contemplated herein. Any disproportionate dilution resulting from such less favorable terms shall be absorbed by the founding stockholders who, collectively, have agreed to surrender such number of shares of Class A Common Stock as are necessary to preserve the common equity position of Investment Unit purchasers as aforesaid." (Pages 12-13)

d. "Therefore, the Company reserves the right to modify the terms of the second round of financing in order to acquire the equity necessary to launch and operate 'The Golf Channel.' Except as limited below, any such modification will not operate to dilute below 14.85% the common equity interest of Investment Unit purchasers. Any disproportionate dilution resulting from modified terms shall be absorbed by the founding stockholders who, collectively, have agreed to surrender such number of shares of Class A Common Stock as is necessary to preserve the common equity position of Investment Unit purchasers as aforesaid." (Pages 28-29)

57. Defendants knowingly and/or willfully and/or recklessly misrepresented a material facts to the plaintiffs with regard to the $15 million Bridge Loan. Namely:

a). Failed to provide an accurate picture of the condition of The Golf Channel and/or the likelihood of obtaining the additional $50 million in equity financing;

b). Withheld information necessary for the Plaintiffs to make a informed decision;

c). Failed to provide full disclosure and/or provided inaccurate information;

d). Provided false or misleading information with the intent to encourage the Plaintiffs not to invest in the Bridge Loan;

e). Controlled the closing date for the additional $50 million in equity financing so as to create the maximum advantage to TGC and the Founders and the maximum disadvantage to the Plaintiffs;

f). Manipulated the affairs of the corporation to the Plaintiffs detriment and in disregard of the standards of common decency and honesty;

g). Utilized inside information and their strategic position for their own preferment;

h). As a result of the activities described above, the money of TGC and the Founders, which was at risk for a mere 60 days during the life of The Golf Channel, acquired a disproportionate equity interest.

58. Defendants engaged in the dissemination of false information and/or the concealment of material information from the plaintiffs.

59. From at least June 2, 1992, defendants have implemented a scheme, course and conspiracy of fraudulent acts in order to deceive plaintiffs. At all times relevant to the matters contained herein, defendants conspired jointly and severally to redefine Round 2 of the capitalization plan so as to avoid their legal liability to the plaintiffs. Such actions constitute an ongoing pattern and practice of fraud.

60.   Said representations were made with the intent to induce plaintiffs to act thereon by investing in TGC or to cause the plaintiffs to fail to invest in the $15 million Bridge Loan.

61.   Plaintiffs, without knowledge of the falsity of the representations and in reliance upon said representations, acted thereon by investing collectively, $1.6 million in TGC or by failing to invest in the $15 million Bridge Loan.

62.   As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

63.   Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

### COUNT THREE: Negligent/Mistaken Fraud

64.   Plaintiffs reassert the allegations set forth in paragraphs 1 through 63 above as if herein set forth.

65.   The representations set forth in Count Two above were negligently and/or mistakenly made.

66.    Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT FOUR: Suppression

67.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 66 above as if herein set forth.

68.    The defendants concealed or failed to disclose material facts to the plaintiffs which they had a duty to disclose.

69.    Without the suppression of these material facts, the plaintiffs would not have invested in TGC; would have invested in the $15 million Bridge Loan; and/or would not have incurred the damages they have sustained.

70.    Instead, because the defendants suppressed these material facts, the plaintiffs acted by investing in TGC; maintaining their investment in TGC and not investing in the Bridge Loan.

71.    As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

72.    Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT FIVE: Breach of Fiduciary Duty

73.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 72 above as if herein set forth.

74.    The defendants are jointly and severally liable for the breach of their fiduciary duty based upon their willful, reckless or negligent acts against the plaintiffs.

75.    As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

76.    Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT SIX: Negligence

77. Plaintiffs reassert the allegations set forth in paragraphs 1 through 76 above as if herein set forth.

78. The defendants owed the plaintiffs a duty to exercise reasonable care not to injure or damage them and/or to exercise such care as a reasonably prudent person would have exercised under the same or similar circumstances. This is a duty to exercise reasonable care in the management of TGC and the business by TGC to prevent any unlawful diminution in the value of the plaintiffs' stock.

79. Defendants failed to discharge or perform the aforementioned duties owed to the plaintiffs.

80. The defendants are jointly and severally liable for their negligence toward the plaintiffs.

81. As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

82. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT SEVEN: Oppression of Minority Stockholders

83. Plaintiffs reassert the allegations set forth in paragraphs 1 through 82 above as if herein set forth.

84. In Ex parte Brown, 562 So.2d 485 (Ala. 1990) the Alabama Supreme Court recognized the Tort of Oppression of Minority Stockholders which is applicable to the actions described herein.

85. The Founders conducted the corporate affairs in such a way as to oppress the plaintiffs' rights as minority shareholders. The plaintiffs as minority shareholders have a right to fairness by the majority and minority shareholders may not be deprived of their just share of corporate gains even though the majority has the right of control of the corporation. The plaintiffs have a right to share proportionally in corporate gains.

86. The Founders have acted to manipulate the plaintiffs stock holdings in such a way as to squeeze out minority interests.

87. The defendants actions were intentional, willful, malicious and taken in reckless disregard of the known legal rights of the plaintiffs.

88. The plaintiffs have been and continue to be damaged as a result.

89. As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

90.    Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

### COUNT EIGHT: Conversion

91.    Plaintiffs reassert the allegations set forth in paragraphs 1 through 90 above as if herein set forth.

92.    On or about February 25, 2000, defendants completed the sale of their shares to Comcast. In doing so, defendants converted a substantial portion of the plaintiffs' equity interest in TGC to their own economic advantage. The defendants actions were wrongful, without cause and constituted a conversion of the plaintiffs' equity interest in TGC.

93.    The plaintiffs have been and continue to be damaged as a result. The defendants actions were intentional, willful, malicious and taken in reckless disregard of the known legal rights of the plaintiffs.

94.    As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

95. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT NINE: Ala. Code § 8-6-19—Securities Fraud[1]

96. Plaintiffs reassert the allegations set forth in paragraphs 1 through 95 above as if herein set forth.

97. In connection with the offer and sale of TGC stock to plaintiffs, the defendants as described hereinabove, have knowingly, willfully and intentionally:

a. Employed devices, schemes and artifices to defraud in violation of §8-6-19;

b. Made untrue statements of material fact in violation of §8-6-19;

c. Omitted to state material facts necessary in order to make the statements defendants made, in light of the circumstances under which they were made, all of which resulted in misleading statements in violation of §8-6-19;

d. Engaged in acts, practices and courses of business which operated and/or would operate as a fraud or deceit upon the plaintiffs in violation of §8-6-19;

e. Sold securities in violation of §8-6-19; and

f. Offered and sold securities to plaintiffs by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the

---

[1] **The allegations contained in Count Nine are not only violations of Alabama law but constitute violations of federal law and the laws of most, if not all, states. (See 15 U.S.C. §78j).**

Page 27

circumstances under which they were made, not misleading to plaintiffs, who did not know of the untruths and omissions with the meaning of §8-6-19.

98. The statutory safe harbor for certain forward-looking statements does not apply to the material misrepresentations and omissions alleged in this complaint because the statements disseminated were not specifically identified as "forward looking statements" when made. Furthermore, to the degree that any statements made by defendants constitute forward looking statements, defendants failed to include any significant cautionary statements in an attempt to distinguish those crucial factors that could and did cause actual results to differ materially from those in the purportedly forward looking statements. Nevertheless, if the statutory safe harbor provisions do apply to any forward looking statements pleaded herein, defendants are still liable since each material misrepresentation was known to the particular speaker(s) to be false or misleading at the time it was made.

99. The plaintiffs have been and continue to be damaged as a result. The defendants actions were intentional, willful, malicious and taken in reckless disregard of the known legal rights of the plaintiffs.

100. As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

101. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

### COUNT TEN: Directors' Liability

102. Plaintiffs reassert the allegations set forth in paragraphs 1 through 101 above as if herein set forth.

103. Throughout 1996 with regard to the $15 million Bridge Loan and on or about September 30, 1998, the defendants were directors of TGC. As such, they are prohibited from acting in their official capacity to make contracts for the corporation that will affect his personal pecuniary interest. As directors, defendants must manage the corporation honestly and impartially and may not achieve personal advantage, profit, or gain from their position. The defendants have the burden to show complete and fundamental fairness in all their transactions involving the company. The defendants, as directors are prohibited from imposing on the corporation; from taking advantage of their position; and from improperly influencing the management of the affairs of the corporation to their benefit and the detriment of the other shareholders.

104. Throughout 1996 with regard to the $15 million Bridge Loan and on September 30, 1998 when the defendants entered into a Call Option and Put Agreement which resulted in their obtaining a return of many, many times their investment and certain other investors obtaining approximately 4 ½ to 5 times their original investment. At the same time it resulted in a return on the plaintiffs investments of approximately 79% of the original investment amount. However,

should the plaintiffs fail to exercise their tag along rights, they may lose their entire investment.

105. As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

106. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT ELEVEN: Professional Negligence of General Counsel

107. Plaintiffs reassert the allegations set forth in paragraphs 1 through 106 above as if herein set forth.

108. Defendant Murvin, upon information and belief, was at times relevant to the matters contained herein, general counsel for TGC.

109. Upon information and belief, defendant Murvin knowingly participated in the commission of the above alleged actions in violation of the standard of care applicable to him as general counsel for TGC.

110. As a proximate consequence of the defendants' actions, the plaintiffs were caused to

suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to 5 times their original investment.

111. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## COUNT TWELVE: Joint and Several Liability

112. Plaintiffs reassert the allegations set forth in paragraphs 1 through 111 above as if herein set forth.

113. Plaintiffs incorporate by reference each and every count herein as to each and every defendant.

114. As a proximate consequence of the defendants' actions, the plaintiffs were caused to suffer damages including but not limited to significant economic injury to the value of their TGC stock; the plaintiffs' investment has been significantly diminished and/or they have purchased stock with a fair market value substantially less than what the defendants represented to the plaintiffs and even less than the purchase price paid by the plaintiffs. On the other hand, the defendants will receive many, many times their original investment and certain other investors will receive 4 ½ to

5 times their original investment.

115. Wherefore, plaintiffs demand judgment against these defendants and each of them jointly and severally for compensatory and punitive damages in an amount to be determined by a jury, interest, attorney fees and costs of court. Plaintiffs pray for such other, further and additional relief to which they may be entitled premises considered.

## PLAINTIFF DEMANDS A TRIAL BY A STRUCK JURY

Respectfully submitted,

William J. Baxley (BAX001)

David McKnight (MCK031)
BAXLEY, DILLARD, DAUPHIN & MCKNIGHT
2008 3rd Avenue South
Birmingham, AL 35233
(205)271-1100
Fax: (205)271-1108

## CERTIFICATE OF SERVICE

I hereby certify that on 20th day of March 2001, I have served a copy of the above and foregoing pleading upon the following counsel of record by United States mail, postage prepaid, and properly addressed:

Andrew P. Campbell, Esquire
Caroline Smith Gidiere, Esquire
CAMPBELL, WALLER & MCCALLUM
2000A SouthBridge Parkway, Suite 330
Birmingham, Alabama 35209

Mark White, Esquire
WHITE, DUNN & BOOKER
2025 3rd Avenue North
600 Massey Building
Birmingham, Alabama 35203

Of COUNSEL